Case on this morning's docket is the case of in re Marriage of Ramona George versus James George. We have to we have Mr John Allman for the appellant and Mr Joshua Bradley for the affilee and you may begin when you are ready to proceed. Good morning, your honors. I am John Allman. I represent Ramona Bond George. The issue that I am presenting on the appeal is the back child support issue and whether or not the defendant was in contempt of court for his non payment of child support and whether he had a defense to that non payment. The facts of the case are very simple in this regard. In 2004 there was a judgment. The defendant was ordered to pay $40 per week as child support. Prior to June of 2007 he was in arrears. He paid I think $160 in 2007. From June 2007 until December he had custody, fiscal custody of the minor child. And no time have we sought child support for that period of time. In December 2007, January 2008 the minor child returned and began to live with the mother again. From that date until September he paid no child support. I took his deposition and asked him why he didn't pay child support. And at first he said he didn't know where to pay it. And I said well you pay it where you always pay it. And then after that his attorney told him on several occasions to pay. He didn't pay until we had a court date coming up and then he paid $2,080 in back child support. I asked him why he didn't pay and he said he just didn't want to. And the implication was he was paid because of the underlying proceedings. The only defense of non-payment of child support is that he has the inability to pay. When I took his deposition and when he testified in court he said that he was working, he was working full time, he was making money, he had the ability to pay, he just didn't want to pay. There is no defense when those are the facts of the case. Why wasn't there a wage deduction in this case? Judge, I don't know. I wasn't in the case when all that happened. That would have alleviated all the problems there, wouldn't it? It would have. And there is now in effect. When I was in the case there wasn't. I think part of the judge is that he was working in frequent hours at times. He was working one or two days a week. He had always, I think my client, this isn't a record, but I think my client had a fairly decent relationship and she wasn't, he had a new family and she wasn't really that concerned. And where was he working again? These pets in Meridian. And he had been there I think at least nine years and maybe more than that, maybe 11 years. He had the ability to pay, he just didn't want to. He was mad and there's no excuse for that. Mr. Bradley in his brief said, well, he didn't pay because he wasn't getting visitation. Well, there's no recognized defense in the law that you don't pay child support even if you're not getting visitation. We disagree that he wasn't getting visitation, but that was their defense to the nonpayment. The trial court, in my opinion, obviously erred when there's $2,000 in child support itself and you don't pay it, you are in violation of the court order. They didn't bring up any defense to that claim in the trial court. There's none in the appeal. There's no reference to any case or court or statute that says any defense for what they've done in this case. And the trial court, I believe, was in error in not ordering that he was in contempt for his willful, contumatious refusal. How much afterwards did he pay the? $2,080. I'm sorry. How long after the hearing was it before he took his refund check or whatever I think it said and made up the error? I don't remember those facts. What I recall, Judge, is that we had a court date in August. We had a settlement conference or a thing with the judge in August and the child support had still not been paid. And I was very vocal about that. And we had a court date coming up and he paid right before the court date. And that was in, I believe, August of 2008 or September of 2008. And nothing to do with his tax return or anything else. He had the money long before that. And in fact, the money. I may be getting cases confused here, but I thought there was something there about a tax return. No. That's okay, Cass. So he just didn't pay. And he didn't have an excuse not to pay. He had the ability to pay his work. Judge Moore didn't find him in contempt. The problem with not finding him in contempt is that he didn't order him to pay my client's attorney's fees for collecting that. And the nonpayment of child support without a finding of contempt and not punishing him for my client having to file a petition for not having the money really defeats the purpose of the statute and harms my client. What were your attorney's fees, Mr. Smith? Judge, I think they were $1,700, $1,300, $1,400. And now we're on appeal. Again, my client has to hire me to enforce her rights to give what's rightfully owed to her. And again, it all comes down to he had the ability to pay and just simply refused. And I've cited in here what his comments were that I said you knew how to pay, you knew where to pay, you just didn't want to pay. And he said, yeah, I didn't want to pay. Did the judge make any statements on the record that formed the basis of his written finding that it was not willful and contumacious? No. We had a hearing. He said, thank you. We went away. We got a written order. And the facts don't support that it wasn't contumacious or willful. There was absolutely no defense presented. He didn't give a reason why he didn't pay. He didn't say, I didn't have the money. In fact, in other parts of the record, he had borrowed money and said that he was saving money to re-borrow the house he was living in so that his daughter would have better living conditions. All at the same time, he's not paying child support. And I'll get to that in Mr. Bradley's appeal on the question of changing custody. But again, there's absolutely no evidence at all of why he didn't pay other than he said, I didn't want to. Is there any questions from the court? I don't think so. Thank you very much. Thank you, Mr. Mr. Bradley. May it please the court and counsel, my name is Joshua Bradley. I represent the respondent, the faculty in this matter, Mr. James George. In light of the fact of what Mr. Hall has said, he has left out several facts and several issues which the court has already addressed with him that I'd like to address with you currently. Firstly, on January 23, 2009, the order was entered in this contract. The hearing which was held to determine about custody and about the petition for contempt on the child support and on visitation abuse and on custody was heard on November 20, 2008. The payment which he is referring to made by Mr. George occurred on September 30, 2008, regarding any back money which was owed. The pertinent facts of this case are a little different from what Mr. Allman indicated to you. This was merely a fact where Mr. George just didn't pay the child support and that that was the case. What happened in the present case is in June of 2007, Mrs. George voluntarily relinquished custody of the minor child to the respondent in the present case. During that period of time, she paid no child support for the minor child and she had limited contact with the child because of the distance. She unilaterally decided to move with her boyfriend to the state of Mississippi and left the child in Illinois in El Dorado with her father. At some point in January or December 2008, the mother coerced Mr. George under a pretense that she would take the child down for Christmas so that she could see him and decided to keep the child in the state of Mississippi without leaving to remove the child from the state and without filing an order. What is clear if you look at the testimony, she had previously contacted her attorney regarding these child support issues in December of 2008 regarding these things. Mr. Allman also was the individual which did the initial divorce in the present case back when the previous judgment was entered in the present case when you're talking about no notice in order to withhold his interest. She kept the child and then left the child in the state of Mississippi until June 27th of 2008. The First Circuit Court in Judge Moore ordered her to return because found that the removal of the child was a proper based upon the standards of Seth Gordon Acker. After that time, and when you deal with the two issues regarding the child support and the petition, it is important to look at the order of the court. It is clear from the order, although Mr. Allman has cited in his brief that no citation was issued, there was a petition for solicitation of use filed on February 13th of 2009, sorry, 2008, which found a new record on C-76. When you look through this, what happened was the child support period which we are talking about is the period of time when she left the Mississippi and when she came back to the state of Illinois. During that period of time, Mr. George was not receiving any type of visitation with the minor child. Now, they tried to portray, well, if the child was available in the state of Mississippi in the present case. But what you have happened is if you look at the case that is cited in Harvard v. Melton, 33, Illinois Code 124, from the 2nd District of 2002 case, just because you remove the child from the state of Illinois, you cannot then go back and claim that you, well, I have the child available down there and you just have to drive down there and pick it up. What she effectively did is constructively constricted his visitation as her own admission stated in his 11-hour drive back and forth to where she was living. What does this have to do with his requirement to pay and duty to pay child support? Well, during the period of time, it's kind of related because what the court essentially found was our basis for our petition for rule of show cause on visitation abuse was denied. We found not to be willful and consummations. Their petition on child support was found not to be willful and consummations. While the court, it appears, said you don't have to pay child support and we're not going to find you in contempt for doing that because we don't feel that it was an error. It also didn't find that her removing the child and not allowing visitation for nine months and not providing any make-up. So you're saying there's a tit-for-tat provision in the law? There's no tit-for-tat provision in the law. Absolutely not. I wasn't aware of it either. But what I'm saying is when you look at the order of the court, you have to assume for a minute that if you find him in contempt for the nonpayment of child support, how do you not find her in contempt for the non? Is that an issue that we? Yes. That's an issue that's in the present case. We have filed a motion on our cross-appeal that basically says, you know, we don't believe he's in hell for child support, but if you do find him, how can you not reverse that and say, oh, well, he wasn't supposed to pay child support, but let her go and say that she wasn't supposed to provide any visitation for those nine months that she withheld the child in the state of Mississippi during that period of time and constructively basically limited his visitation. It's clear from her own testimony that after she moved to the state of Mississippi and went down there, she only came up to visit the child maybe once or twice. So are you, I mean, obviously you think that she was, her behavior was contemptuous. Yes. Are you admitting that your client's behavior was contemptuous also in not paying child support? I don't believe that my client's behavior was contemptuous, but I believe that you can't find one without finding the other. It's a difficult situation. Well, there's two different sets of facts that you have in two different issues here, right? Well, you have the one issue of whether or not at the period of time when he was not paying child support and he made it up and you look at the record to see, okay, well, he said that he had the ability to pay and he didn't have the ability to pay and he didn't know where to send it. She was living in the state of Mississippi and had virtually left the child in his care for a period of seven months without any contact. And then after she took the child down to the state of Mississippi, did he know where to pay or did he know how to pay at that period of time? And the court tended to have the ability to believe that testimony as it relates to that. As it appears, the court tended to believe her testimony as it relates to the visitation abuse, wherein, you know, there was no visitation abuse even though he wasn't provided with visitation during that period of time. It's one of those situations which it appears from the record that the court in the present case decided, well, you both screwed up here, but I'm not going to hold either one of you in contempt of court over this issue regarding visitation or regarding the issue of child support in the present case. Not a situation, and it can't be different. I agree with you, Your Honor, that each one of them are exclusive of the other. You cannot withhold child support for lack of visitation. You cannot withhold child support. I want to make sure I'm clear about this. You're saying, and let's just take the appellant's claim first, that your client was in contempt for not paying child support. Are you confessing that right now, that he had no lawful authority not to pay child support? I'm not confessing that, Your Honor, but what I am saying is this, that based upon the facts which were presented, the court had to find that he was willful and contumacious in his disregard. The law in Charos, which was cited in my brief, says that the court has to find that his actions were an attempt to disregard an order of the court or disregard some type of in the fly in the face of the court when it comes to contempt. Didn't he essentially say that, that he just didn't feel like paying it? He said that in part of it, but then in part of it he also said he didn't know where to pay. In part of it, you know, he said he wasn't for certain process because she moved to the state of Mississippi at a certain point. Mr. Almas has addressed, of course, the issues which are more pertinent to his client and what his claim is. But in the present case, she took off to the state of Mississippi and left. And the other period, and the other part of this is during the period of time when my client had custody of the child, they paid no support to the benefit of this child. She paid nothing. She didn't see the child. She didn't do anything with the child in the present case. But regardless of that, when you have... It sounds like the defense is kind of like an equitable defense. Two wrongs don't make a right. I mean, that sounds like what I'm getting from you here. Is that the basis of your argument? Essentially, yes. I mean, you can't either find them both in contempt almost or you can find neither one of them in contempt. That's what the court did here in the present case. It said, okay, you've had your day in court. Now go off and deal with this child in the present situation. Because when you deal with a petition for removal from my perspective on the visitation abuse, you know, it's clear that she left without authority in the court. It's clear that the court made her come back. It's clear she was 11 hours away. It's clear that when she knew she was keeping a child, that she wasn't going to be allowed suitable visitation or any visitation, nor did she make arrangements. And when she did come back, the time of visitation when she saw the child for a handful of times was for hours and not the alternating weekends, not the holidays, and so forth, in the order in which the two of them agreed to, which was prepared years earlier. She knew these things when she left the state because she had lived out there and left the kid in my client's care during that period of time. Which leads me to the next portion of my argument, which is the court denied the petition to modify custody in the present case. When you look at what the facts are in the present case and when you look at what happened, here are the undisputed issues. In June of 2007, she takes off and she leaves the kid in my client's care, takes off, sees the kid a handful of times, and then leaves the state for an extended period of time to be with her boyfriend. When she comes back to the state, she doesn't even come back to get the child. She coerces my client into bringing the child to her and then keeps her for a period of nine months. Now, when you look at all of the facts which were presented, you have to look at the fact that she voluntarily relinquished custody of a child. And all these claims that she makes about the environment and what was happening, she knew all of those things when, in fact, she made this decision to do that. When she decided to leave the state without authority of the court, she decided to leave the child there. And the court rightfully returned her to the state of Illinois. But what that gives us is when you look at Rickardson's sentence, and you look at Wyckoff, where you have a period of a person or individual that is not allowing or trying to interfere with the custody relationship between one parent and the other, you have a situation where she is, in effect, inhibiting or trying to hinder my client's rights and ability and really shows her colors as to what she wants to do. Her concern was not for the best interest of the child. Her concern was for what she wanted to do in the present case. It's for her wanting to move to the state of Mississippi. She wasn't married at the time. She was living with her boyfriend. After she moved back, and the previous evidence and testimony expresses this fact, the child also moved around on several occasions. Now, Mr. Allman would like to suggest that in light of these factors, well, the kid did well in school. Well, if the kid's an intelligent kid, that's great. And maybe the kid can do well everywhere that the child goes. But in this situation, where you have a relinquishment of custody, regardless of what they say, when you have a situation where she unlawfully takes the child from the state of Illinois, removes it without authority of the court, takes it to a different state, keeps the child in that state for an extended period of time without allowing any meaningful visitation between that child and his father, whom she had lived with for the period, was enrolled in school in Illinois, and resided in Illinois for her entire life, and then takes off and does this, what you have is a situation where custody should have been modified in the present case, where custody of a child and the stability of the child come into question. Mr. George had lived in the same residence in the same town. His wife was a schoolteacher. He had just had a new child and was a stay-at-home parent. He worked on the weekends with these pets in order to help supplement their income. But what the testimony was was that Mr. George was not the breadwinner in this family. It was his wife, Amber, who was the breadwinner in the present situation. And he would be allowed more time in order to spend with the child and to work with the child during the week. Ramona, Bob, Ramona and George worked. She had continually worked throughout this time. When she came back, she was going to work. When the child went to Mississippi, she worked. All of these things, while having a parent who was employed, but having another parent who was in Illinois who followed the rules and who did what he was supposed to do, you have a serious question as to whether or not the court should have modified custody in the present situation based upon her prior acts. Because here's the situation. She now moved not back to the same school district where she was originally. She moved to a different school district in Waukonda in Hardin County. I'm not saying anything bad about that school district, but what we have is a move from Hardin to Mississippi to El Dorado to Mississippi and back to Waukonda in a different area from which she even resided. When you have that whole situation, the totality of the circumstances relating to this child in this period of time, it raises an issue and it raises a question as to whether or not the custody  So the substantial change in circumstances were the unstable home, my guess, because of that? Well, there's actually several factors. There's the stability of the child. You have the child moving around from place to place as he has to the mother. Not anything that the father did. You have the stability of the father who was staying in the same place, was working, was a stay-at-home father taking care of his kids. I'm saying the change in circumstances. Yes. He hadn't changed his circumstance, had he? He had not changed his circumstance. Okay. So what were the substantial change in circumstances after the initial custody to warrant modification? The moving around, the instability, the moving to Mississippi, while removal cannot be a basis in its entirety, it can be considered. You also have the situation of the visitation and what she did when she moved the kid to Mississippi and effectively denied him any visitation for any period of time. It's not like she took the kid and said, okay, I'm moving to Mississippi. Let's figure out how we're going to get the kid back and forth. Let's see how you're going to arrange for your order of the court to get you all for any weekends pursuant to the order. It was the kids in Mississippi. I've got him down here, and there's nothing. You want to see the kid, come down here and see him. Assuming the child was not interviewed by the court? I do not believe the child was interviewed by the court. Did the child have a separate representative? No, the child was not a J.L. presented for the child in the present case. Do you agree with the statement in the reply brief that says, destiny made the decision to discontinue living with James? When you have the situation about that, the only evidence presented as to what was going on for my client, the child was getting along great. She moved to Mississippi, and it wasn't even the mother that called and told James that she wasn't coming home. It was the child, the 11-year-old child, in the present case, called her father and said, I'm not coming home, I'm not going back. Okay? Finish your statement. That's not a decision for an 11-year-old child. Thank you, Your Honor. Thank you, Mr. Bradley. Mr. Allman, do you have rebuttal? I do want to make two quick points. When my client left the child with Mr. George, if Mr. George wanted to, he could have come to the court and filed a petition to change custody and say, I have the child. And there would have been a change in custody right then. He didn't do that. So he kind of sat on his rights in that regard, and he loses it. Because, as this court knows, and everybody knows, agreements between the parties about custody and visitation that aren't approved by the court are not enforceable. He had custody of the child for six months and did nothing. He can't complain that he didn't get child support when he didn't do anything about it. He can't complain that he didn't get custody because he didn't do anything about it. When the little girl calls him and says, I don't want to come back, I don't want to live with you, the mother's in Mississippi, I'm not representing her, and she decides she's going to keep the child there. They file an emergency petition and restraining orders and all kinds of things, and we appear in front of the court, and she says, I didn't know I had to give permission to the court. The judge says, file your petition, and then we'll move forward. You didn't know. So she had hired me. We filed a petition for change to remove the child from the state of Illinois. By the time this happens, it's already February, late February or March, I believe, and so she's there for the spring semester of school because this is going to be litigated. When the court finally rules on that petition and says you have to come back, she promptly came back. I think there is some confusion on Mr. Bradley's part about the burden of proof and the evidence that's required on both petitions. The petition for the Fair to Pay Child Support and Contempt finding, we presented our evidence and we met our burden of proof. It is an absolutely different burden of proof and evidence that he needs to present for a change in custody or for visitation abuse. The court in this case said that her failure to provide visitation was not willful and consummationist. He also didn't present any evidence at trial, although I'm not making this a big point. He presented no evidence at trial that said that his client had specific visitation on a specific day and was there to exercise it and didn't get it. Now, that's a proof question and I don't want to be ticky-tacky. My client was in Mississippi and she came back several times and brought the child and had visitation over that time when the court knew she was gone and while it was still hearing the pleadings and making decisions in the case. When we go to the change in custody position of Mr. Bradley where he says there's been a change in circumstances, the court made very specific findings about mom's a good mom, good environment, child's well-adjusted to her family, her home, and her environment. Everything about the child was found to be perfect in the court's eyes. One of the reasons that the court, and the court doesn't say why it didn't pick his client or why it denied, but here's some of the things that I would look at and that I think the court would look at. When you don't pay child support and you have an obligation to pay, isn't that enough to deny a change in custody right there? Because there's absolutely no reason he didn't pay. And if you are not paying child support when you have a court-ordered obligation to do so, I think that says a lot about your ability to be the custodial parent and whether you'll follow the court's order in the future. That alone is sufficient. Aside from that, the facts in this case were that Mr. George lived in a house that had a leaking roof and had water coming into the bedroom where this little girl was supposed to sleep. It was so bad that there was mold in the room and she slept on the living room couch every day that she lived there for the whole six months. I don't know if that's enough to get DCFS involved. It's probably not. But if we're talking about living arrangements and what's best for the child, sleeping on the living room couch for six months, to me, is unacceptable. And it may have been unacceptable to Judge Moore also. There was a list of things that the court talked about, or that I should say that I talked about to the court. Thank you, Your Honor. I think that concludes your time. I don't think we do. Thank you both for your briefs and arguments, and we'll render a ruling.